IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INPUT/OUTPUT TECHNOLOGY, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br>(Judge Wiese) |

DECLARATION OF DAVID A. JENKINS

I, David A. Jenkins, hereby state as follows:

1. I am currently employed as a Quality Assurance Specialist, GS-1910-11, at the Defense Supply Center Columbus, Columbus Ohio (DSCC), a primary level field activity of the Defense Logistics Agency (DLA). I have been employed in this position since April 2006. From March 1986 to April 2006 I was an Equipment Specialist, series GS-1670. In my positions both as an Equipment Specialist and a Quality Assurance Specialist, I work and have worked closely with Contracting Officers providing them advice concerning technical matters in reference to the supplies and equipment DSCC purchases for the Armed Forces. One of my duties is the technical evaluation of alternate offers. An alternate offer is an offer from other than the approved source or item that is not the exact part number item cited in the Acquisition Identification Description (AID). (Exhibit A p. 2) The alternate offeror's product must be identical to or be physically, mechanically, electrically and functionally interchangeable with the product cited in the AID. Id.

2. When I evaluate an alternate offer I must first determine if it meets the saving thresholds for local evaluation and if necessary for evaluation by the Engineering Support Activity (ESA) for the item. (Exhibit A p. 2) Then I must determine whether it meets the minimum needs of the government and thus is locally acceptable. (Exhibit A p. 5) This is normally done by comparing the item to approved item or if the offer is based on the original equipment manufacturer's drawing of the item and the offeror providing the item also provides the drawing, then the assessment is based on a review of the drawing. The data submitted by the offeror must cover design, materials, performance, inspection or testing criteria and other characteristics of the item. (Exhibit A p. 2 )

3. Once I am satisfied that the item is locally acceptable I must then determine if it is required to be forwarded to the ESA for evaluation and approval or disapproval. The alternate offer must be forward to the ESA for further evaluation under two circumstances: if it is a critical application item or if it has an Acquisition Method Suffix Code of "C". (Exhibit A p. 5 and Exhibit D p.2)

4. In May of 2006, I received an alternate offer from a Contracting Officer/Buyer for a procurement of backplane assemblies, National Stock Number 5998-01-366-6543. The alternate offer was submitted by Aschbacher and Associates on behalf of Frequency Selective Networks (FSN), which would be manufacturing the backplane as a subcontractor for Aschbacher and

Associates. The reason I now know that it must have been submitted in May of 2006, is that I have reviewed the Request for Engineering Support, Form 339 (Exhibit B p. 1) and it indicates that I forwarded it to the ESA on May 23, 2006. In this case, as with all alternate offers, I followed the DLA Technical-Quality Policy and Procedure guidance, Section 5.2.1 and Appendix 24A. (Exhibit A) The buyer provided the alternate offer data package and identified the cost savings to be in excess of the threshold savings required for (ESA) review. At the time of review the threshold values were $200 for local review and $1200 for each ESA review. (Exhibit A p. 2)

5. I reviewed FSN's data package, provided by Aschbacher and Associates, for completeness and technical merit. (Exhibit C) Included in the package was the Original Equipment Manufacturer's drawing [Hughes Aircraft (now Raytheon) drawing 1690533] (Exhibit C, Tab G pp. 1 & 2); drawings of similar items manufactured by FSN (Exhibit C, Tab H); the company's quality manual (Exhibit C, Tab C); a certification statement certifying FSN will be manufacturing the item in accordance with the OEM drawing (Exhibit C, Tab F); company brochures (Exhibit C, Tab A); and piece part supplier information (Exhibit C, Tab J).

6. The data package Exhibit C submitted by Aschbacher and Associates on behalf of FSN included a standard table of contents for an alternate item data package with Tabs A through W. The package did not include information or data under Tabs D, E, I, M, O, and W. Although, these Tabs are often included in data packages they are not always required, nor were they

needed to properly evaluate Aschbachber and Associates' alternate offer on behalf of FSN. For instance Tab W was titled Deviations, this tab would only apply if the contractor intended to manufacture an item and was planning to deviate from the Original Equipment Manufacturer's (OEM) design. This did not apply because FSN's data package indicated it did not intend to deviate from the OEM's design. The data package as submitted by Aschbacher and Associates for FSN was complete and contained all necessary information needed to properly evaluate the offer. Exhibit C is an exact copy of the package submitted to CECOM.

7. Later I reviewed the government's system files for historical information concerning the similar items, as listed in Exhibit C Tab L, for FSN's quality history as it related to contracts with the government. FSN's contract history with the government indicated no quality problems with any of the similar items manufactured for the government. I compared the cited similar items with the technical requirements for the backplane assembly to verify FSN's capability to successfully manufacture the backplane assembly. Finally, I reviewed FSN's quality manual to ensure FSN had a system in place to maintain production quality. As a result of my review I found the offer to be locally acceptable.

8. The Acquisition Method Suffix Code (AMSC) for the backplane assembly is "C." An AMSC code of "C" means the part requires engineering source approval by the design control activity in order to maintain the quality of the part. An alternate source must qualify in accordance with the

design control activity's procedures, as approved by the cognizant Government engineering activity. (Exhibit D) The cognizant Government engineering activity for backplane assembly was the Communications and Electronics Research and Development Command (CECOM) at Fort Monmouth, New Jersey. Thus because the backplane assembly was coded with an AMSC of "C" I forwarded the data package along with a DLA Form 339, Request for Engineering Support (Exhibit B and C ), requesting engineering support to CECOM for review. CECOM determined FSN's alternate offer was acceptable and noted its approval on the DLA Form 339 ( Exhibit B p. 2, Part II, Section 20 (b)).

9. After CECOM approved FSN as a manufacturer of the backplane assembly, action was then initiated to add the FSN cage code and part number for the backplane assembly to the Total Item Record (TIR). Attached is a copy of the confirmation that shows the cataloging action was received by the Defense Logistics Information Services. (Exhibit E ) Later FSN's Cage Code and Part Number for the backplane assembly appear in the TIR as an approve source. The buyer was then informed that the procurement of the backplane assembly from FSN was acceptable.

10. I understand that Input/Output alleges the backplane assembly National Stock Number (NSN) 5998-01-366-6543, is a qualified products list/qualified manufacturers list item and the requirements of the Federal Acquisition Regulation (FAR) Part 9.2 (48 C.F.R. Part 9.2) and the

qualification requirements of FAR 52-209-1 (48 C.F.R. 52-209-1) apply to backplane assembly NSN 5998-01-366-6543. The backplane assembly, NSN 5998-01-366-6543 is not a qualified product list item.

I swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 7 day of June 2007.

DAVID A. JENKINS
Product Specialist
DSCC