IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INPUT/OUTPUT TECHNOLOGY, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | CoFC No. 07-322<br>**BID PROTEST**<br>(Judge Wiese) |

**DECLARATION OF THAD DRAPALA**

I, Thad Drapala, hereby state as follows:

1. I am the president of Input/Output Technology, Inc. (IOT), a Small Business providing design and manufacturing services to the DoD since 1980. I received my Engineering degree from the University of Illinois in 1974 and ever since had been working in the Defense industry as an Electronic Engineer, where I have done design work on major programs such as the U-2, A-10, F-15, B-2 and the F-117 aircraft. Over these thirty years, IOT had similarly done work for major Defense contractors such as Lockheed-Martin, Northrop, Bendix, Hughes, General Dynamics, Textron, and as a prime DoD contractor. IOT's success is based on timely completion of over two-hundred prime DoD contracts and subcontracts. This translates into thousands of deliverables with **ZERO** Quality Deficiency Report ("QDRs") since inception.

2. Specifically, for the purposes of this procurement, I was involved in the fabrication of Tele-Communication Pin-Plate Backplane wire-wrapped assemblies as early as in 1970, while at Methode Electronics in Chicago, IL. This experience has

Exhibit A



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

allowed IOT to become a manufacturer of High Reliability Backplanes for military applications. As a result, IOT was awarded many DoD contracts for like backplanes, and as early as in 1992 IOT won the AN/TPQ-36/37 Pin Plate Assemblies (Note: the item referred herein as "backplane" has a unique part number ["PN"] and is part of the end item Pin Plate Assy, PN 1690533), from U.S. Army CECOM, Fort Monmouth, NJ, and Hughes, Ground Systems Division, Fullerton, CA (the original prime). IOT has been the only backplane supplier responsible for keeping the critical AN/TPQ-36/37 FireFinder Radar system operational on all war efforts since 1992. In its contribution to the war effort "for the soldier", IOT has mobilized its company staff on many occasions to fill urgency requests as fast as in few days to keep the fielded systems running.

3. In order to impress upon the Court the criticality of the backplane in the AN/TPQ-36/37, one should know what requirements CECOM Engineering and their Quality Assurance ("QA") personnel had imposed on candidate suppliers for the AN/TPQ-36/37. First, even with the many contracts IOT had at that time with CECOM for printed wiring board ("PWB") based circuit card assemblies, and its Mil-Q-9858 Quality System, IOT underwent an extensive pre-award site survey by CECOM Engineering and QA personnel. This included review of IOT's Standard Manufacturing Procedures Manual (depicting assembly procedures, wire-wrapped connection standards, tools, testing and inspection criteria to Mil-Std-1130 (titled "Connection, Electrical, Solderless Wrapped"), and its Quality Assurance Manual. IOT had to have experienced manufacturing personnel, and special equipment to fabricate these backplanes. Even back in 1992, a "wire-wrapped" Pin-Plate Assembly was considered a legacy product and had only few qualified suppliers to the defense industry. The repertoire of automated



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

equipment, fixtures, sample backplanes, and IOT's in-depth experience was the key factor in receiving the award. Second, IOT had to perform extensive First Article Testing on three backplanes and Pin-Plates. This included mechanical, environmental and electrical testing to insure the design parameters were met by IOT's fabrication and testing process, before any production deliveries to Government depots could commence.

4. IOT successfully completed the First Article Testing Program satisfying Hughes Dwg. 780369 for the Backplane Assembly PN 1643137, and in accordance with Mil-Std-1130 for the hundreds of individual solderless wire wrapped connections on end-item Pin Plate Assy PN 1690533 (NSN 5998-01-366-6543). IOT's First Article testing was witnessed by local DCMA Quality Assurance Representative and the resulting First Article Test Report was subsequently approved by CECOM Engineering authorizing IOT to ship Pin-Plates to the Government.

5. Later, buying responsibility for the Pin Plate was transferred to DSC-Richmond, then Tobyhanna Army Depot, and finally DSC-Columbus. More then once the Government awarded contracts for AN/TPQ-36/37 Pin Plates only to discover after many months that the contractor would not be able to perform and ended up cancelling the contract(s). Regrettably, DSCC's ability to evaluate a contractor's capability appeared to rely on how many open contracts the "low bidder" had with DSCC. After some ten months later with two cancelled contracts and an Agency protest by IOT, DSCC came back to IOT by placing a small "Urgency" order while embarking on developing Alternate Offers.

6. After reviewing the Government Affidavits and declarations with their supporting documents, I was not able to find a single instance where Frequency Selective



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Networks ("FSN") or Aschbacher and Associates, Inc. ("AAI") proclaimed to have ever manufactured a Pin Plate assembly, or a Backplane, or has even addressed the fabrication of Pin plates or Backplanes.

7. Specifically, the correspondence and brochures supplied by AAI and FSN in TAB A clearly show FSN as a manufacturer of Filters, Discriminators and Resistor Assemblies, which has no relevancy to fabricating Pin plates or Backplanes. The Quality Assurance Manual (Tab C) submitted by FSN was issued in 1979 with the last revision dated April 29, 1993. In its Introduction (Tab C p3 of 73) the Quality Manager drives the point of the importance of their QA manual in the "ever changing filter technology" with no mention whatsoever of backplanes or even circuit card assemblies which FSN is shipping to the Government circa 1999 per information in TAB J, K and L . In TAB F - 1of 2, FSN states they are in "possession or have access to all documentation required to manufacture the circuit card assembly" and are submitting the OEM's drawing under Category 2 (Similar item). There are several problems with FSN's assertion. One must question any correspondence that: (1) has no date; (2) has a subject different then what the Alternate Offer is being Approved under (namely Category 1- Same item); and (3) its text is addressing a different product, namely a circuit card assembly, not a Pin Plate assembly. In TAB K, a "Category 2" Item is in the subject and wherein FSN equates a circuit card to a backplane (and not the end item a Pin plate) by stating these "are about equal in difficulty since they both use a number of active and passive components and number of components covered by the specification drawing". This is false, the backplane contains no active and only one passive components. FSN further equates the "Raytheon drawing" to a "Bendix drawing". Since FSN did not provide a specific



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Bendix drawing number, I will take the liberty of assuming they were from TAB L, which lists ten "Bendix" circuit card assemblies, of which none are designated as a Pin Plate or a Backplane assembly. In summary FSN's data package has no relevancy to the manufacture of Pin Plates or backplanes.

8. It is my opinion that the declaration submitted by Mr. Truskowski is lacking in technical merit by his limited understanding of what is a Pin Plate assembly, and its importance to the successful operation of the AN/TPQ-36/37 Radar system. By his statement (in par. 4) that "The backplane assembly is not a complicated item to manufacture" and equating a supplier's capability of manufacturing circuit cards to fabricating electro-mechanical assemblies is even more absurd in view of his mechanical engineering background. Accordingly, I question Mr. Truskowski's expertise and position within the AN/TPQ-36/37 Program Office. I would be very surprised if such analysis would ever originate from the AN/TPQ-36/37 Program Office, their Engineering Branch, Tobyhanna Depot, or even the present OEM (Raytheon).

9. Specifically, in par. 4 of Mr. Truskowski's declaration, he states the subject item is made up of few components ("a circuit card, one capacitor, several connectors, wire, terminal lugs, shrink tubing and miscellaneous hardware"). For reference, IOT has built many different circuit card assemblies and Pin Plates for the AN/TPQ-36/37, and to this date we consider the Pin plate as the most involved and difficult to built because of the various fabrication processes and testing. I wonder if Mr. Truskowski opinion would change if he only knew there were over one-thousand-seven-hundred-nineteen (1,719) individual pieces/parts which make up one Dwg. 1690533 Pin Plate assembly.



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

10. Re: par. 5 of Mr. Truskowski's declaration, after evaluating the information submitted by FSN in par. a-g, he declares "The offeror's proposal was complete and demonstrated technical knowledge of the item…" How absurd, there is no discussion of any kind by FSN on the subject of Pin Plates. Not even FSN claims to have ever build a Pin Plate or backplane, and from their QA manual (driven to the manufacture of Filters according to their own QA manager) one could see Filters are their specialty. Nevertheless Mr. Truskowski over simplifies the manufacture of Pin Plates and construes that FSN is capable of building Pin plates. He also goes on to say, FSN "had manufactured similar items with similar manufacturing processes and quality verification procedures, Exhibit B Tab L". I fail to see any connection with the testing of circuit card assemblies in FSN's data package to the processes listed in Hughes Dwg. 780369 and Mil-Std-1130 for the hundreds of solderless wire-wrapped connections on the end item Pin Plate.

11. Re: par. 9 of Mr. Truskowski's declaration, finally Mr. Truskowski granted FSN approval via Form 339 (Exhibit A) under Category 1 (Same item). See Jenkins Declaration, Exhibit A at A24-2. Clearly, a Category I--Same item, approval is based on an Item previously provided/shipped to Original Equipment Manufacturer (OEM). DSCC's own vendor information web page for "Alternate Offer/Source Approval Request" reflects this on page 5 of the guideline document (http://www.dscc.dla.mil/downloads/small_business/vendor_info.pdf). Approval at this level would require evidence such as inspection, shipping records, actual sample, and/or OEM acceptance correspondence, etc. No such records could be found in the data



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN
ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

package submitted by FSN's and AAI. Accordingly, I believe Mr. Truskowski's approval under Category 1--Same item, is improper and should be rescinded.

12. In my opinion the improper categorization would lead DSCC to think they will be receiving the SAME ITEM as previously shipped to the OEM. After all, DSCC did recognize the criticality of the end item. See Declaration of Mr. Renee L. Fredrick par. 4, in which it states "This part requires engineering source approval by the design control activity in order to maintain the quality of the part".

Further the Declarant sayeth not. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 18, 2007.

Thad Drapala



PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER